Case 1:21-cv-00184   Document 94   Filed on 08/22/24 in TXSD   Page 1 of 8

United States District Court
Southern District of Texas
**ENTERED**
August 22, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUAN MANUEL TORRES, | § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. 1:21-CV-184 |
| ANTONY BLINKEN, *et al.*, | § § § | |
| Defendants. | § | |

## ORDER AND OPINION

Plaintiff Juan Manuel Torres filed this action under 8 U.S.C. § 1503, seeking a declaratory judgment that he is a United States citizen. In April 2024, the Court held a two-day bench trial. Based on the record and the applicable law, the Court concludes that Torres has not demonstrated by a preponderance of the evidence that he was born in the United States.

**I.      Findings of Fact**

At trial, the Court heard testimony from Jose Manuel Torres-Herrera (Plaintiff's father), San Juana Manzanares-Lopez (Plaintiff's mother), Elisa Meade (the woman who registered Plaintiff's birth in Texas), and Javier Cavazos-Adame (a criminal fraud investigator for the United States Consulate in Mexico). The Court bases its decision on these witnesses' testimony, the admitted exhibits, and the parties' stipulated facts.

The central issue in this matter concerns whether Manzanares gave birth to Plaintiff in the United States–specifically, in San Benito, Texas. The Court reserves the resolution of this issue for the following section. For now, the Court presents background facts, on most of which the parties agree. To the extent that the parties presented controverting evidence as to these facts, the Court resolves the dispute as indicated here.

Jose Manuel Torres-Herrera was born in Tampico, Tamaulipas, Mexico, which is about three hundred miles south of the United States border with Mexico. When he was seven or eight years old, he moved to the border town of Matamoros, Tamaulipas and has lived there since.

San Juana Manzanares-Lopez was born in San Fernando, Tamaulipas and moved to Matamoros when she was about nine. She met Torres-Herrera in the early 1990's, while they were working at a Trico Components factory. In January 1994, they married, and eventually had two children, the Plaintiff and his younger sister.

When living in Matamoros, Torres-Herrera and Manzanares possessed Border Crossing Cards, or "local cards", that enabled them to legally enter the United States. The couple regularly walked over the Gateway International Bridge into Brownsville, Texas to shop. Once or twice per year, the couple also rode a bus from Brownsville to Harlingen, Texas to visit Torres-Herrera's first cousin once removed, Consuela Vega, who was older and suffered from diabetes. One of Vega's legs had been amputated, so when Torres-Herrera and Manzanares visited her, one of Vega's friends would pick them up at the Harlingen bus station to drive them to Vega's home. Vega's friends would also drive the couple back to the Harlingen bus station for the return to Brownsville and, ultimately, back to Matamoros.

In early 1994, Manzanares was pregnant with Plaintiff. She sought and received pre-natal care at the Mexican National Social Security Clinic in Matamoros.

On March 29, 1994, Manzanares gave birth to Plaintiff.

The following month, on April 5, Elisa Meade registered Plaintiff's birth with the state of Texas, recording his place of birth as San Benito, Texas. At some later point, Torres-Herrera returned to the United States to meet Meade and receive the Texas birth certificate for Plaintiff.

On May 25, Torres-Herrera and Manzanares registered Plaintiff's birth with the Mexican Civil Registry, receiving a Mexican birth certificate (*Acta de Nacimiento* (PX2), Doc. 89–2) that reflected his place of birth as Heroica, Matamoros, Tamaulipas.

During Plaintiff's infancy, he suffered health problems, for which his parents sought and received medical care for him at the Mexican Social Security Institute (IMSS) hospital near their home in Matamoros. The IMSS hospital required that Plaintiff's parents present a Mexican birth certificate to receive government medical insurance benefits.

In April 1995, Manzanares attempted to cross the Gateway International Bridge into the United States with Plaintiff. A United States Immigration Official questioned her about whether Plaintiff was born in the United States or Mexico. An official prepared a statement recording that Manzanares admitted that she had given birth to her son in Matamoros, but had paid a midwife in San Benito to obtain a Texas birth certificate for him. Manzanares signed a document confirming those admissions. After the meeting, officials confiscated Manzanares's Border Crossing Card and refused her and her son's entry into the United States. Plaintiff did not return to the United States for the next twenty years.

**II.   Conclusions of Law**

Plaintiff brings this declaratory judgment action under 8 U.S.C. § 1503(a), which provides a mechanism for an individual within the United States to challenge the denial of a right or privilege based on the determination of her citizenship.

**A.  Applicable Standards**

Under Section 1503(a), "[t]he Court must make a *de novo* determination of whether a plaintiff is a United States citizen." *Garcia v. Clinton*, 915 F. Supp. 2d 831, 833 (S.D. Tex. 2012), *aff'd sub nom. Garcia v. Kerry*, 557 F. App'x 304 (5th Cir. 2014). "There are two sources of citizenship, and two only: birth and naturalization." *Thomas v. Lynch*, 796 F.3d 535, 538 (5th Cir. 2015) (quoting *Bustamante-Barrera v. Gonzales,* 447 F.3d 388, 394 (5th Cir. 2006)). In the

current matter, Plaintiff claims he acquired citizenship at the time of his birth by virtue of being born in the United States.

In a Section 1503(a) case, the district court holds a bench trial and weighs the evidence, determines the credibility of witnesses, and resolves conflicting testimony. FED. R. CIV. P. 52(a)(1), (6); *United States v. Jennings*, 726 F.2d 189, 190 (5th Cir. 1984). A plaintiff must prove his claim to citizenship by a preponderance of the evidence. *Escalante v. Clinton*, 386 F. App'x 493, 496 (5th Cir. 2010) (citing *De Vargas v. Brownell*, 251 F.2d 869, 870 (5th Cir. 1958)). "The burden of showing something by a preponderance of the evidence . . . simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622 (1993) (cleaned up). In essence, if the evidence demonstrates only that it is equally likely that the plaintiff was born in a foreign country as in the United States, the plaintiff has not carried his burden.

"A contemporaneously filed foreign birth record creates a presumption of alienage", although that presumption can be rebutted. *Sanchez v. Kerry*, No. 4:11-CV-02084, 2014 WL 2932275, at *4 (S.D. Tex. June 27, 2014), *aff'd*, 648 F. App'x 386 (5th Cir. 2015). Courts generally afford delayed birth certificates less evidentiary weight compared to more contemporaneously issued birth certificates. *See, e.g.*, *De La Cruz Vargas v. Blinken*, 569 F. Supp. 3d 556 (S.D. Tex. 2021), *appeal dismissed sub nom. Vargas v. Blinken*, No. 22-40007, 2022 WL 2448086 (5th Cir. Feb. 28, 2022) (affording less evidentiary weight to a 1974 delayed Texas birth certificate than to a 1968 Mexican birth certificate); *Sanchez v. Kerry*, No. 4:11-CV-02084, 2014 WL 2932275 (S.D. Tex. June 27, 2014), *aff'd*, 648 Fed. Appx. 386 (5th Cir. 2015) (giving less evidentiary weight to a 1988 delayed Texas birth certificate than to a 1987 Mexican birth certificate); *Pena-Sanchez v. Clinton*, No. 11-cv-00125, Order, ECF No. 34 (S.D. Tex. March 28, 2013) (viewing a 1971 Mexican birth certificate as holding greater evidentiary weight than a 1974 delayed Texas birth certificate).

Baptismal certificates, medical records, and school records constitute evidence of an individual's birthplace, but courts consider such documents as "secondary evidence". *See, e.g.*, *De La Cruz v. Clinton*, No. A-11-CV-675-AWA, 2012 WL 1941373, at *2 (W.D. Tex. May 29, 2012).

As for testimony, courts weigh the credibility of witnesses, but receive a plaintiff's self-serving statements and those of interested witnesses "with a grain of salt." *De Vargas*, 251 F.2d at 871; *see also Garcia*, 915 F. Supp. 2d at 835; *Patel v. Rice*, 403 F. Supp. 2d 560, 565 (N.D. Tex. 2005), *aff'd*, 224 F. App'x 414 (5th Cir. 2007).

### B. Application

Applying the applicable standard and legal principles to the evidence admitted at trial, the Court concludes that Plaintiff has not established by a preponderance of the evidence that he was born in the United States. The Court first presents Plaintiff's factual theory indicating that he was born in the United States, and then assesses that theory's credibility.

#### 1. Plaintiff's Version of His Birth

At trial, Plaintiff's parents testified that on March 28, 1994, they crossed the Gateway International Bridge into the United States to visit Torres-Herrera's relative, Vega, in Harlingen. One of Vega's friends picked them up at the Harlingen bus station and drove them to her home. The couple stayed the night at Vega's house, and the next morning, one of Vega's friends drove them back to the Harlingen bus station to return to Brownsville.

At the bus station, Manzanares began feeling stomach pain. As they awaited the bus, a woman approached them and offered to call someone to help them with Manzanares's pregnancy. Within a short period, a middle-aged woman arrived and examined Manzanares's abdomen. The woman then drove the couple to a house less than half an hour away, in San Benito.

At the house, Manzanares went into labor. She progressed into the evening, with her and Torres-Herrera in a room with a birth attendant. No one else was present. Around 10:00 p.m., Manzanares gave birth to Plaintiff. After the birth, the attendant took a sample of Plaintiff's blood

from his foot. The couple spent the night in the home with their newborn son, and the next day, a woman drove them back to Matamoros.

Days after the birth, Meade contacted Torres-Herrera and arranged for him to obtain Plaintiff's Texas birth certificate from her.

### 2. Assessment of Plaintiff's Factual Theory

Manzanares and Torres-Herrera provided relatively consistent testimony, but some discrepancies arose. For example, Torres-Herrera testified that they entered the United States in March 1994 with the intent to visit his relative in Harlingen. In contrast, Manzanares recalled that they came to the United States to shop, and only while in Brownsville did they decide to visit Vega. Overall, however, they recounted the same narrative regarding Plaintiff's birth.

The rest of the trial record, though, casts serious doubts on their story. As an initial matter, the Court finds the proposed timeline difficult to accept. The couple arrived at the Harlingen bus station, and only there did Manzanares begin to feel birth pains. Incredibly, within minutes, an unknown woman approached them and called someone to help them. Another woman arrived and drove them to a nearby home, where an attendant helped them deliver the baby. This timeline presents a highly coincidental encounter. Although corroborating evidence could render the story believable, the trial record contains no such evidence.

Perhaps most damaging to Plaintiffs' theory is Meade's testimony. During the 1990's, she worked in the United States for two midwives (Dominguez and Saldivar). When working for Saldivar, Meade only filled out documents and did not attend births. With Dominguez, she assisted with pre-natal checkups and births, in addition to completing paperwork. Importantly, she did not recall any instance in which she delivered a baby alone. And not only did she not specifically remember Plaintiff's birth, she did not recall ever picking up a mother to drive her to the clinic, or a mother coming to the clinic in an emergency situation. The apparent uniqueness of such an event would render its occurrence memorable, but Meade recalled no such episode.

Finally, Meade testified that when taking a blood sample from a newborn, she obtained the sample from the umbilical cord, not the foot.[1]

The documentary evidence also undermines Plaintiff's factual theory. Plaintiff's parents registered his birth with Mexican authorities, representing that he had been born in Matamoros. (*See Acta de Nacimiento* (PX2), Doc. 89–2) When they baptized him in December 1996, they again recorded a Mexican birth. (*See* Baptismal Certificate (PX4), Doc. 89–4) When Plaintiff required medical care as an infant, his parents used his Mexican birth certificate to secure services from the IMSS hospital near their Matamoros home, again listing his place of birth as Matamoros. (*See* Vaccination Record (PX7), Doc. 89–7 (also recording that Plaintiff received vaccines during his first six months of life in Mexico))

Plaintiff relies on the Texas birth certificate, registered within a week of his birth. While this contemporaneously filed birth certificate carries significant evidentiary weight, any presumptions that such a document creates can be rebutted. Here, the trial record undermines the significance of the Texas birth certificate. Principally, Meade confirmed that in 1996–or about two years after Plaintiff's birth–she pled guilty to fraudulently registering births with the State of Texas. Although she pled guilty to only one instance, she testified that she fraudulently registered additional births as having occurred in Texas. In fact, in 1997, she signed an affidavit stating that she had "filed a false birth certificate" for Plaintiff on April 5, 1994. (Meade Affidavit (DX20), Doc. 90-20, 8) Although she testified at trial that she did not recall the affidavit or the circumstances that led to it, she did not deny that the document contains her signature. At the very least, Meade's affidavit strips the Texas birth certificate of any evidentiary weight.

In addition, Manzanares's statements to United States officials in 1995 directly contravene her trial testimony. In that year, Manzanares attempted to cross the Gateway International Bridge

---

[1] Neither Manzanares nor Torres testified directly that Meade herself picked them up at the bus station or delivered the baby. But Plaintiff called Meade as a witness, identifying her as a midwife who knew about the circumstances of his birth. (*See* Pl.'s Witness List, Doc. 55) Plaintiff has not identified any other person who he alleges delivered him.

into the United States with Plaintiff. (*See* Record of Deportable Alien (DX4), Doc. 90–4, 2) When questioned, she told an Immigration Official that she had given birth to her son in Matamoros. She conceded that she had paid a midwife in San Benito to obtain a Texas birth certificate for him. Although Manzanares now claims that she never made those statements, she does not deny that she signed a document containing that information. Neither she nor Plaintiff offer any motivation for an Immigration Official to fabricate such statements, and cannot deny that for purposes of this lawsuit, it is in the direct interest of Plaintiff for his mother to deny the 1995 confession.

Considering the trial record as a whole, and based on the applicable law, the Court concludes that Plaintiff has not demonstrated by a preponderance of the evidence that he was born in the United States.

### III. Conclusion

Based on the Court's findings and conclusions within this Order and Opinion, it is:

**ORDERED** that Plaintiff Juan Manuel Torres's request for a declaratory judgment is **DENIED**; and

**ORDERED** that Plaintiff Juan Manuel Torres's request for attorney's fees is **DENIED**.

The Court will separately issue a Final Declaratory Judgment in accordance with this Order and Opinion.

Signed on August 22, 2024.

Fernando Rodriguez, Jr.
United States District Judge